## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ROGER TURNER, | ) | CASE NO.  5:06CV3023 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| CITY OF AKRON, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Plaintiff Roger Turner (Turner or Plaintiff) filed the present employment action against Defendant City of Akron (City or Defendant), claiming that he has been subjected to racial discrimination. Plaintiff also alleges that the City retaliated against him for participating in protected activity, in violation of federal and state law.

Pursuant to Fed. R. Civ. P. 56(c), the City has sought summary dismissal of Plaintiff's First Amended Complaint. (Doc. No. 20.) Plaintiff opposes the motion, and the City has filed a reply.[1] (Doc. Nos. 23 and 31, respectively.)  Plaintiff has also filed a motion to strike certain affidavits offered by Defendant in support of its dispositive motion. (Doc. No. 30.) Defendant opposes this motion. (Doc. No. 34.)

For the reasons that follow, Defendant's summary judgment motion is **GRANTED**. Plaintiff's motion to strike is **DENIED**.

---

[1] Without seeking leave, Defendant has filed a reply brief that exceeds the 20 page limit set for memorandum filed in standard track cases under Local Rule 7.1(f). The Court hereby **STRIKES** Defendant's reply brief.

# I.

## <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Since 1985, the City has required every new firefighter hired to become a paramedic as a condition of employment. (Affidavit of Dale Evans, Doc. No. 20, Attach. 3, ¶ 8.) Plaintiff began his employment with the City of Akron as a firefighter in September, 1988. Consistent with the City's policy regarding new hires, Plaintiff was trained as a paramedic, receiving his certification in 1989. He served in the role of paramedic/firefighter for the City from 1989 to 2003. (Amended Complaint, Doc. No. 12, ¶¶ 5-6; Evans Aff., Item 2.)

Plaintiff filed his first lawsuit against the City on August 12, 2002. In that action, Plaintiff alleged that he was the victim of race-based discrimination and was exposed to a racially charged environment. (Affidavit of Bruce H. Christensen, Jr., Doc. No. 20, Attach. 10, Item 1, Compl.) He also alleged that he was the victim of retaliation following the filing of a charge of discrimination with the Equal Employment Opportunity Commission in 2001. (*Id.*, ¶¶ 37-38.) On February 5, 2003, the parties entered into a settlement agreement that resolved the lawsuit. (Christensen Aff., Item 2.) Pursuant to the agreement, Plaintiff released the City from liability for all claims which had been set forth or could have been set forth as of the date of the agreement.[2] (*Id.*)

Later that same year, Plaintiff was involved in a physical confrontation with another African-American firefighter, Lieutenant Dennis Ragins. On

---

[2] The settlement agreement did not foreclose Plaintiff's right to pursue any worker's compensation claim which had been brought or could have been brought by Plaintiff up to the date of the agreement. (*Id.*)

June 12, 2003, the City found that Plaintiff had intentionally "bumped" Lieutenant Ragins in the hallway, and required Plaintiff to serve a 12 hour suspension. (Affidavit of Charles Gladman, Doc. No. 20, Attach. 13, Item 5.) Plaintiff appealed the disciplinary action first to the Mayor of the City of Akron and ultimately to the Akron Civil Service Commission. The Commission upheld the suspension. (Affidavit of Larry Bunner, Doc. No. 20, Attach. 5, ¶ 18.)

On July 29, 2003, Plaintiff filed a charge of discrimination with the Ohio Civil Right Commission (OCRC) to challenge the suspension. (Pl. Opp. Brief, Doc. No. 23, Attach. 8, Declaration of Roger Turner, ¶ 29.) In his charge, Plaintiff alleged that he was suspended "in retaliation for filing previous charges of discrimination." (Affidavit of Elaine Davidson, Doc. No. 20, Attach. 9, Item 5.) According to Plaintiff, the retaliation also involved a forced participation in building inspector classes. (*Id.*) The OCRC issued a "no probable cause" determination on January 29, 2004. (*Id.*; Deposition of Roger Turner, Doc. No. 29, p. 177.)

In a letter dated September 5, 2003, Plaintiff requested permission to leave the paramedic program.[3] (Evans Aff., Item 1.) Pursuant to the union contract at that time, every October eight paramedics were permitted to "opt out" of the program. To be eligible to "opt out," the firefighter/medic had to have served a minimum of five years as a paramedic.[4] (Evans Aff., ¶ 5.) Because only eight individuals a year may elect to "opt out," permission was granted based on seniority. (*Id.*) Effective October 26, 2003,

---

[3] In his letter, Plaintiff indicated that he "decided to no longer participate in the paramedic program. By eliminating this requirement I will be able to devote 100% of my time towards other very valuable efforts. Consider this my letter to withdraw per union contract." (Evans Aff., Item 1.)

Plaintiff and seven other firefighter/medics were permitted to leave the paramedic program. (Evans Aff., Item 2.)

In 2005, Plaintiff decided that he wished to re-enter the paramedic program. On April 20, 2005, Plaintiff sent a memo to District Chief Dale Evans, the EMS Bureau Chief, asking for information regarding the procedure for re-entry. (Evans Aff., Item 4.) Seven days later, Evans replied to Plaintiff's request by indicating that he was advised by then Chief Gladman that, due to economic concerns, requests for re-entry would not be approved at that time. (Evans Aff., Item 5.) To date, Plaintiff has not been allowed to participate in the paramedic program.

Plaintiff challenged the decision to deny him re-entry into the paramedic program in an OCRC charge filed October 5, 2005. (Evans Aff., Item 2.) Plaintiff's charge also revisited the suspension he received for "intentionally bumping" Lieutenant Ragins. Significantly, Plaintiff limited his charge to these two discrete events. A "no probable cause" determination was issued by the OCRC on June 1, 2006. (*Id*.)

In his deposition, Plaintiff testified that between 2004 and 2007, he bid under the collective bargaining agreement on a variety of paramedic positions but has been denied these bids because he was not currently in the paramedic program.(Deposition of Roger Turner, Doc. No. 29, pp. 14-37.) Plaintiff alleges that the denial of these bids was retaliation for engaging in protected activity.[5] (Turner Dep., pp. 14-37.)

---

[4] The five year service requirement was increased to eight years in the 2007 agreement. (Evans Aff., ¶ 5.)
[5] Plaintiff also claims that he was not considered for overtime when other firefighters with less seniority were offered overtime. (Pl. Decl., ¶ 19.)

4

In the summer of 2006, Plaintiff applied for a position on the City's SWAT medic unit. (Am. Compl., ¶ 18.) The parties agree that the stated reason why Plaintiff was not considered for the SWAT medic team was the fact that he had not served as an active paramedic since October 26, 2003.[6] (Am. Compl., ¶ 20; Evans Aff., ¶ 16, Item 8.)

That same year, 2006, Plaintiff pursued a position on the Fire Investigation Unit (FIU). (Am. Compl., ¶ 22.) Plaintiff was never interviewed for the position. (Am. Compl., ¶ 30; Gladman Aff., ¶ 10.) Matt D'Avello was appointed to the FIU in 2006 by then Fire Chief Charles Gladman. (Am. Compl., ¶ 31; Gladman Aff., ¶ 11.) In 2007, Chief Gladman appointed a second firefighter, Ellis Polk, to a vacant position on the FIU. (Am. Compl., ¶ 32; Gladman Aff., ¶ 12.) Both Ellis and D'Avello are white.

Plaintiff initially filed the present action in the Summit County Court of Common Pleas on November 22, 2006.[7] Defendant removed the action to this Court on December 20, 2006. (Notice of Removal, Doc. No. 1.) The First Amended Complaint contains four causes of action. In Count One, Plaintiff alleges that he was retaliated against for engaging in protected activity, in violation of Ohio Rev. Code § 4112.02(J). Count Two raises a retaliation claim under 42 U.S.C. § 2000e, *et seq*. Counts Three and Four raise race discrimination claims under Ohio Rev. Code § 4112.02 and 42

---

[6] According to Evans' letter to Plaintiff, active membership in the paramedic program was a requirement for participating in the SWAT medic unit. (Evans Aff., ¶ 16, Item 8.)
[7] Plaintiff brought suit after receiving his "right to sue" letter determination on August 24, 2006. (Davidson Aff., Item 3.)

U.S.C. § 1981, respectively. While it is not entirely clear from the pleadings or Plaintiff's briefing on summary judgment, it appears that Plaintiff's race discrimination claims and his retaliation claims share the same set of operative facts. Indeed, both sets of claims are supported by the same factual allegations. (Am. Compl., ¶¶ 1-30.) Defendant seeks summary dismissal of all claims.

## II.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law [ . . .].

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein [. . .]. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies

6

upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as

7

to material facts. *Id.*

Applying the above principles to the present case, it is clear that Fed. R. Civ. P. 56(c) assigns the initial burden of proof to Defendant.  If the Court finds that Defendant has satisfied this burden, however, Plaintiff will be obligated to "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky DOT*, 53 F.3d 146, 149 (6th Cir. 1995). Plaintiff will not be permitted to rest upon the allegations in his Amended Complaint. Rather, he will have to come forward with affirmative evidence in support of each and every element of his discrimination and retaliation claims. *Id.* at 150. If Plaintiff is unable to offer affirmative evidence which controverts Defendant's motion or its assertions of fact, evidence submitted by Defendant will be taken as true and Defendant shall be entitled to summary judgment. *See Kemper v. American Broadcasting Co.*, 365 F. Supp. 1275, 1277 (S.D. Ohio 1973).

## III.

## LAW AND ANALYSIS

### A.    Plaintiff's Motion to Strike

Before the Court reaches the merits of Defendant's dispositive motion, it must address two preliminary issues: one procedural and one jurisdictional. Turning first to the procedural issue, Plaintiff seeks to strike portions of the affidavits of Brent Combs, Elaine Davidson, and Bruce Christensen and certain exhibits attached to these affidavits, which were offered by Defendant in support of summary judgment. Plaintiff also seeks to strike the entire declaration of Diane Miller-Dawson.

Plaintiff's motion to strike is brought under Fed. R. Civ. P. 12(f). While some courts have utilized Rule 12(f) to strike affidavits offered in support of

8

summary judgment, there is no basis in the Federal Rules of Civil Procedure for doing so. Rule 12(f) is limited to "pleadings and is inapplicable to other filings." *Dawson v. Kent*, 682 F. Supp. 920 (N.D. Ohio 1988) aff'd 865 F.2d 257 (6th Cir. 1988). *See Michaels v. City of Vermillion*, 2007 WL 893185, *2 (N.D. Ohio Mar. 22, 2007) (Motion to strike summary judgment brief and attached exhibits was improperly brought under Rule 12(f).

Under the Federal Rules, a "pleading" is defined as:

> [A] complaint and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint, if a person who was not an original party is summoned under the provisions of Rule 14; and a third-party answer, if a third-party complaint is served.

Fed. R. Civ. P. 7(a). "An affidavit is not a pleading that is subject to a motion to strike under Rule 12(f)." *Scott v. Dress Barn, Inc.*, 2006 WL 870684, *1 (W.D. Tenn. Mar. 31, 2006). *See Fox v. Michigan State Police Dep't*, 173 Fed. Appx. 372 (6th Cir. 2006). For this reason, alone, Plaintiff's motion should be denied.[8] *See e.g., Lombard v. MCI Telecommunications Corp.*, 13 F. Supp. 2d 621, 625 (N.D. Ohio 1998) (motion to strike affidavits and exhibits offered in support of summary judgment denied as improperly brought under Rule 12(f)).

Even if Rule 12(f) were the proper vehicle for challenging the affidavits offered by Defendants in support of summary judgment, the motion still would not be well taken. Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment, and permits the offering of affidavits that are

---

[8] The motion fails for the additional reason that it was untimely. Rule 12(f) provides for a motion to strike to be within 20 days of the filing of the offending pleading. The summary judgment motion was filed on October 29, 2007, while the motion to strike was not filed until November 29, 2007.

"made on personal knowledge" that "set forth such facts as would be admissible in evidence." Additionally, the affidavits must "show affirmatively that affiant is competent to testify to the matters stated therein […]." Fed. R. Civ. P. 12(f).

Plaintiff seeks to strike all or part of the affidavits offered by four individuals.  First, Plaintiff seeks to strike the entire affidavit of Brent Combs, claiming that this witness was never identified in discovery and his affidavit contains an impermissible summary of Defendant's overtime records. As Defendant notes, however, Plaintiff is in error when he represents that Mr. Combs reviewed and summarized overtime records. Rather, the record before the Court on summary judgment shows that Deputy Chief Larry Bunner reviewed and summarized these records. (Bunner Aff., ¶ 17.) Chief Bunner was identified by Defendant and deposed by Plaintiff, and the records he summarized were made available to Plaintiff during discovery. Further, Mr. Bunner has demonstrated that he has personal knowledge of the records, and, thus, satisfies Rule 56(e). More importantly, the Court does not rely upon his summary of the overtime records in ruling on summary judgment. *See Fox,* 173 Fed. Appx. at 375 (no error could result from the attachment of certain affidavits to summary judgment motion where the district court did not rely on the affidavits in deciding the motion).

Similarly, the Court need not rely upon the affidavit of Finance Director Diane Miller Dawson and the fiscal year-end budgets for the City attached to the affidavit. These records were offered in support of Defendant's legitimate, nondiscriminatory reason for denying Plaintiff re-entry into the paramedic program. As is set forth below, Defendant's burden with respect to the legitimate reason for any employment decision is one of production, alone, and is accomplished without reference

10

to Ms. Dawson's affidavit. As such, Plaintiff is in no way prejudiced by the offering of Ms. Dawson's affidavit. *See Sutton v. United States Small Business Admin.*, 92 Fed. Appx. 112, 119 (6th Cir. 2003) (no prejudice from the submission of certain affidavits where the district court did not rely upon the affidavits in ruling on summary judgment).

The final two affidavits, offered by Elaine Davidson and Bruce Christensen, address Plaintiff's prior lawsuit and his charges of discrimination filed with the OCRC. The affidavits, which have attached to them a copy of the lawsuit and a copy of the documents from the administrative proceedings, were not offered to contest the veracity of the allegations of discrimination that were at the heart of this prior protected activity. Instead, they were offered for two specific and permissible reasons. First, these documents were offered to demonstrate what claims Plaintiff brought before the OCRC and in the prior lawsuit in order to determine whether the Court has jurisdiction under Title VII. As set forth below, Plaintiff must exhaust his administrative remedies before pursuing a claim under Title VII. *Abeita v. Transamerica Mailings*, 159 F.3d 246, 254 (6th Cir. 1998). Additionally, the 2003 settlement agreement limited Plaintiff's right to bring future claims against Defendant. The Court has both the right and the obligation to satisfy itself that it has jurisdiction to hear any claims before it, and these documents are relevant for that purpose. *See Olden v. Lafarge Corp.*, 383 F.3d 495, 498 (6th Cir. 2004)

These documents also provide background for the timing of Plaintiff's protected activity. The Court cannot properly evaluate Plaintiff's allegations of retaliation without taking into account the temporal proximity of the alleged retaliation to the asserted protected activity. *See Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). Again, these documents are not considered by the Court as evidence, or the absence of

11

evidence, of discrimination, and are properly reviewed under Rule 56(e).

For all the reasons set forth above, Plaintiff's motion to strike is

**DENIED**.

### B.    Preservation of Title VII Claims

Turning now to the issue of jurisdiction, Defendant challenges the Court's ability to hear one of Plaintiff's two retaliation claims. In Count II of the Amended Complaint, Plaintiff raises a claim of retaliation under 42 U.S.C. § 2000e, *et seq.* Defendant argues that the Court lacks jurisdiction over this claim because Plaintiff failed to exhaust his administrative remedies by raising the issue of retaliation in his 2005 OCRC charge. The Court agrees.

As even Plaintiff concedes, "Federal Courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge." *Abeita*, 159 F.3d at 254. *See Ang. v. Procter & Gamble Co.*, 932 F.2d 540, 544-45 (6th Cir. 1991). While retaliatory conduct that allegedly occurred after the filing of the discrimination charge is generally exempted from this filing requirement, conduct that occurred prior to the administrative filing must be included in the charge. *Abeita*, 159 F.3d at 254.

Plaintiff's October 5, 2005 administrative charge was limited to his suspension for the incident involving Lieutenant Ragins and the denial of Plaintiff's request to re-enter the paramedic program. (Davidson Aff., Items 1, 2.) He did not check the box marked "retaliation" in response to the query "I believe I was discriminated against because of my: ___" (Item 1.) Plaintiff also failed to offer any allegations in his

2005 charge that could be construed as raising the issue of retaliation. Thus, to the extent that Count II involves retaliation allegedly occurring before the filing of the 2005 OCRC charge, the Court lacks jurisdiction to entertain the claim. *See Abeita*, 159 F.3d at 254. Additionally, there is no evidence in the record that would support a finding of jurisdiction to hear allegations of subsequent retaliation under Title VII.

While Plaintiff concedes that he did not meet the filing prerequisite under Title VII, he observes that 42 U.S.C. § 1981 has no such requirement and that his retaliation claim can be considered under § 1981. (Pl. Opp., p. 7.) Even if the Court applies a liberal interpretation to the Amended Complaint, however, it cannot conclude that Plaintiff has raised a retaliation claim under § 1981.[9]

Nonetheless, Plaintiff has raised a retaliation claim under state law. In Count I of the Amended Complaint, Plaintiff alleges that Defendant retaliated against him in violation of Ohio Rev. Code § 4412.02(J). (Am. Compl., ¶ 41.) Exhaustion of administrative remedies is not required in actions under § 4112. *Elek v. Huntington Nat'l Bank*, 60 Ohio St. 3d 135 (1991).

C.     **Race Discrimination Claims**

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court set forth the formula courts should rely upon in evaluating claims of discrimination under Title VII. This same formula is applied to discrimination claims brought under 42 U.S.C. § 1981. *Patterson v. McLean Credit Union*, 491 U.S. 164

---

[9] The only reference to 42 U.S.C. § 1981 appears in Count III, which is strictly limited to race discrimination. (Am. Compl., ¶ 47.)

(1989). Further, the Ohio Supreme Court recognized in *Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Com*., 66 Ohio St. 2d 192, 197 (1981), that the *McDonnell Douglas* burden shifting analysis applies to discrimination claims arising under Ohio Rev. Code § 4112.02. *See Detzel v. Wellman*, 141 Ohio App. 3d 474 (6th Dist. 2001). As such, it is appropriate to address the various race discrimination claims together using the same legal analysis. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

The burden of proof established in *McDonnell Douglas*, and later clarified by *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), is divided into three stages. At the first stage, the plaintiff must prove a *prima facie* case of age discrimination. *Burdine*, 450 U.S. at 252-53. If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.,* quoting *McDonnell Douglas*, 411 U.S. at 804. If the defendant meets this burden, the final stage requires the plaintiff to prove that the proffered reason was merely a pretext for unlawful discrimination. *Burdine,* 450 U.S. at 253, citing *McDonnell Douglas*, 411 U.S. at 804. Pretext is established by a direct showing that "a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible." *Burdine,* 450 U.S. at 256. *See Kline v. TVA*, 128 F.3d 337, 342-43 (6th Cir. 1997).

Generally, under *McDonnell Douglas* and *Burdine*, a plaintiff can establish a *prima facie* case of race discrimination by showing that (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified

14

for the position he sought; and (4) he was replaced by a person outside the protected class. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004); *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995).

While several alleged adverse employment actions involved Plaintiff being passed over for employment opportunities in favor of white firefighters, Plaintiff also alleges that his treatment by Defendant on various occasions was less favorable than treatment received by comparable non-protected employees. Where an employment discrimination claim rests on allegations that non-protected individuals were treated better, a plaintiff sets forth a *prima facie* case when he establishes "(1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees." *Mitchell*, 964 F.2d at 583.

1. *Prima Facie Case*

While Defendant concedes that Plaintiff is a member of a protected class, it argues that Plaintiff can prove little else to establish even a *prima facie* case of discrimination. One by one, Defendant challenges each element of the *prima facie* case.

Without attempting to answer the question, Defendant poses the query of whether Plaintiff has suffered an adverse employment action at the hands of Defendant. Not every indecency or poorly received employment decision rises to the level of adverse. Such a change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank* & *Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). To satisfy this prong of the *prima facie* case, Plaintiff must establish that the employer's actions of which he complains were "materially adverse." *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996).

Factors that are to be considered in determining whether an action is materially adverse include: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indicies that might be unique to a particular situation." *Crady*, 993 F.2d at 136. *See Kocsis*, 97 F.3d at 886.

Plaintiff cites a litany of incidents that he believes constituted adverse actions taken against him on the basis of his race. While some actions certainly had a negative impact on the terms and conditions of Plaintiff's employment, others are nothing more than perceived slights or inconveniences that cannot be considered, even at the *prima facie* stage, as evidence of discrimination.[10]

For example, Plaintiff complains that he was been singled out by being transferred to "undesirable duties." (Pl. Opp., p. 2.) Pursuant to City policy, a shift commander may be required to ask firefighters to "fill-in" at other stations to cover any labor shortages caused by vacations, illnesses, and training. (Hiltbrand Aff., ¶ 3.) The record shows that in 2007 Plaintiff was asked to fill-in at Station 9. (*Id.* ¶ 5.) Plaintiff has not demonstrated that this temporary reassignment changed the conditions of his employment in any meaningful way. There is no evidence that his rate of pay or amount of benefits to which he was entitled were altered, that his duties were materially modified, or that he lost any prestige from this temporary transfer. As such, it cannot be relied up by Plaintiff to set forth a *prima facie* case of discrimination. *See Kocsis*, 97 F.3d

---

[10] Defendant does not identify any particular actions that it believes cannot be considered adverse. Nonetheless, a review of the record shows that not all actions rise to the level of "material adverse."

at 885 ("Reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims.")

Similarly, a remark made by Deputy Chief Hiltbrand regarding Plaintiff's gear cannot be considered an adverse action. In late August 2007, while at the scene of a fire, Deputy Chief Hiltbrand noticed that Plaintiff was not wearing part of his protective gear called "bunker pants."[11] When Deputy Chief Hiltbrand inquired of Captain Blasdel at the scene whether Plaintiff's station had instituted a new policy that dispensed with the need to wear such gear, he was advised that the drivers of the rigs often did not wear the bulky pants when they were driving. While Deputy Chief Hiltbrand determined that Plaintiff had not been a driver on that day, Plaintiff was not disciplined for his failure to wear the gear. (Hiltbrand Aff., ¶¶ 7-8.) Without some evidence that the terms and conditions of employment were negatively affected by this series of events, it cannot support a finding of an adverse action.

Other actions complained of by Plaintiff do constitute adverse actions. The 12-hour suspension for "bumping" Lieutenant Ragins and the denial of sick leave for Plaintiff's failure to produce an "appropriate" doctor's note both resulted in a reduction of pay. Obviously, such disciplinary actions negatively impacted Plaintiff's employment.

The denial of re-entry into the paramedic's program, followed by the denial of a position on the SWAT medic team and the rejection of bids for various paramedic positions, also were materially adverse. Not only are a paramedic's duties different than that of a firefighter's, as evident from the different training required for

17

each position, the collective bargaining agreement in force at the time required Defendant to permit all active paramedics up to 164 hours in overtime for training and service. (Evans Aff., ¶ 6.) Similarly, the position Plaintiff sought in the Arson Bureau would have involved substantially different job duties and could, arguably, be considered more prestigious than that of firefighter. *See Kocsis.* Finally, the denial of or reduction in overtime opportunities resulted in a loss of potential income and can clearly be considered materially adverse.

These actions satisfy the second prong of the *prima facie* case, and can certainly be factored into the final analysis of whether Plaintiff was subjected to race discrimination. Thus, the Court moves on to Defendant's argument that Plaintiff has not satisfied the third prong; namely, that Plaintiff was "qualified."

With respect to his request to the re-enter the paramedic program, and the resulting denial of bids on paramedic positions and a position on the SWAT medic team, Defendant argues that Plaintiff was not qualified because he had opted out of the paramedic program and re-entry was subsequently restricted. (Def. Mot., p. 12.) According to Defendant, Plaintiff's "own action by opting out of the paramedic program in 2003" prevents him from making out his *prima facie* case. (*Id.*)

A similar argument was rejected by the Sixth Circuit in *Cline v. Catholic Diocese*, 206 F.3d 651 (6th Cir. 1999). In *Cline*, a teacher in a religious private school brought suit against her former employer for gender discrimination after she was discharged. The school maintained that the teacher was no longer qualified because she had engaged in sexual relations outside of marriage, and that this action was inconsistent

---

[11] Bunker pants protect a firefighter's legs and feet. (Hiltbrand Aff., ¶ 7.)

with the school's ministry and teachings.

        The Sixth Circuit held that the district court erred in considering this evidence at the *prima facie* stage. The court found that this evidence, though relevant to the ultimate question of pretext, had no impact on whether the teacher met the qualifications of an educator. The court explained that "when assessing whether a plaintiff has met her employer's legitimate expectations at the *prima facie* stage of a [discrimination] case, a court must examine the plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for [the adverse employment action.]" *Id.* at 661.

        Likewise, in the present case, Defendant's decision to deny Plaintiff re-entry into the paramedic program due to economic concerns represents Defendant's non-discriminatory reason for its employment decision. It does not, however, have any bearing on Plaintiff's qualifications as a paramedic. As such, it would be inappropriate to consider it at the *prima facie* stage. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574-575 (6th Cir. 2003).

        Considering Plaintiff's qualifications independent of Defendant's non-discriminatory reason, it is clear that Plaintiff meets the minimal standard of proof necessary at the *prima facie* stage. *See Burdine*, 450 U.S. at 253 (the *prima facie* requirement for making a Title VII claim "is not onerous"); *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987) (the *prima facie* burden is "a burden easily met.") It is undisputed that Plaintiff had previously completed the training necessary to become a paramedic and had served in that role for many years before choosing to opt out of the program. (Turner Decl., ¶ 3.) Further, Plaintiff maintains that he is still qualified to serve as a paramedic

and Defendant has failed to offer any evidence to the contrary. (*Id*.) Consequently, the Court finds that Plaintiff has met the third prong of his *prima facie* case.

Finally, Defendant challenges the fourth[12] prong of the *prima facie* case. While Defendant concedes that Plaintiff has identified white employees he believes received more favorable treatment than he did, Defendant argues that these white firefighter/medics are not similarly situated.

"It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated in all respects." *Mitchell*, 964 F.2d at 583 citing *Stotts v. Memphis Fire Dep't*, 858 F.2d 289 (6th Cir. 1988). Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff wishes to be compared must have engaged in similar conduct, and have been subjected to the same standards, without the presence of mitigating circumstances that would distinguish their situation from that of the plaintiff's. *Mitchell*, 964 F.2d at 853.

Defendant invites the Court to employ a strict interpretation of the term "similarly-situated" that would be limited to non-minority employees who were nearly "identical" to Plaintiff in circumstance. (Def. Mot., p. 13.) In the years since the standard was first announced in *Mitchell*, however, the Sixth Circuit has warned against the employment of a rigid standard for comparison. Rather, the court has explained that "in applying [this] standard courts should not demand exact correlation, but should instead seek relevant similarity." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

---

[12] In a disparate treatment cased premised on the "others received better treatment" argument, this would be the second prong of the *prima facie* case. *See Mitchell*, 964 F.2d at 583.

*See Singfield*, 389 F.3d at 562. Thus, the Court will examine the proffered comparable employees for relevant similarity.

Plaintiff identifies seven white firefighters who were permitted to re-enter the paramedic program between 1990 and 2006.[13] Defendant argues that the circumstances surrounding the decisions of re-entry for each of these employees takes them out of the realm of similarly-situated. For example, Defendant points out that Tim Semelsberger was hired in 1997 and never opted out of the paramedic program, and Richard Marsh retired on disability on August 18, 1990.[14] (Evans Aff., ¶ 19.) Matthew McAvinew, Joe Bryant, and George Spikerman each resigned from the City's fire department and were treated as new hires upon their return to service.[15] (*Id*.) Ken Meyn was hired in 1990 but failed the National Registry exam. All paramedics must pass this exam to be certified. In lieu of a discharge, Meyn was suspended for 30 days, during which time he successfully completed the exam. At the conclusion of his suspension, he was required to serve at least five years as a paramedic. Finally, John Beavers was permitted to opt out of the paramedic program in May of 1999, but was permitted by then District Chief Roger Hoover to re-enter the program in September of 1999. (*Id*.)

---

[13] Plaintiff offers the following individuals as possible comparables: Tim Semelsberger, Matthew McAvinew, Joe Bryant, George Spikerman, Ken Meyn, Richard Marsh, and John Beavers. (Pl. Dep., Doc. 29, Ex.2, Responses to Interrogatory # 6.)

[14] Tim Semelsberger was hired in 1997 and was subsequently suspended for violating the residency requirement. He was an active paramedic before and after he served the suspension in 2006. Richard Marsh was hired in 1972 and retired on disability when the Fire Chief was George Romanoski. (Evans Aff., ¶ 19.)

[15] Matthew McAvinew was hired in 1991 and remained an active paramedic until he resigned from the City's employ in 2001. Upon his rehire in December, 2002, he was treated as a new hire and required to serve as a paramedic for five years. Joe Bryant was hired in 2003. He was dismissed from paramedic school in April, 2005, and subsequently resigned from the fire department's employ. When he was reinstated in January, 2006, he, too, was treated as a new hire and was required to participate in the paramedic program for five years. Similarly, George Spikerman was hired in 1991 but failed to complete the paramedic program and was discharged in 1992. Upon completion of the paramedic program he was rehired in March, 1993, and was required to serve five years as a paramedic. (Evans Aff., ¶ 19.)

Defendant argues that the circumstances surrounding the participation of these employees in the paramedic program were materially different than that of Plaintiff. McAvinew, Bryant and Spikerman were all considered new hires and required to serve the five year minimum service mandated for all new hires. Tim Selelsberger and Richard Marsh never opted out of the program. Finally, Meyn and Beavers were allowed to opt back in before the freeze on such requests was put into effect. Defendant underscores the fact that none of these "comparables" opted out since the new policy of denying such requests went into effect.[16]

Without even addressing the significance of the factual differences identified by Defendant with respect to Plaintiff's comparables, Plaintiff argues that the City exercised its discretion to permit the comparable white firefighters entry or re-entry into the paramedic program.[17] He insists that this same discretion should have been afforded Plaintiff's request. (Pl. Opp., p. 13.)

There is certainly some question as to whether Plaintiff's comparables are relevantly similar. Nonetheless, the Court need not reach the question of whether these factual differences render Plaintiff's comparables dissimilar because, even assuming the existence of a *prima facie* case, Plaintiff fails to meet his burden of demonstrating the existence of genuine issues of material fact on the ultimate issue of racial discrimination.

---

[16] Defendant also observes that Plaintiff conveniently failed to acknowledge that black firefighters left the paramedic service and were permitted to return under circumstances similar to Plaintiff's white comparables. Defendant notes that Darrel Hopson, Todd Webb, Greg Washington and Willie Cheatham failed one or more of the qualifying tests and were allowed to return as new hires like Bryant, Spikerman and Meyn. (Evans Aff., ¶ 20.)

[17] Plaintiff does note that McAvinew was not really considered a "new hire" because Defendant credited his service date from the date of his original hire. (Turner Decl., ¶ 34.)

2.      *Defendant's Legitimate, Non-Discriminatory Reasons*

Assuming Plaintiff has established his *prima facie* case of discrimination, Defendant would now be required to proffer a legitimate, non-discriminatory reason for the employment decisions at issue herein. *See Burdine*, 450 U.S. at 254. The *Burdine* Court emphasized that this burden is merely one of "production" because "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. at 253.

Plaintiff argues that, at least with respect to the decision to deny him re-entry into the paramedic program and presumably the subsequent decisions to deny him a position on the SWAT medic team and to reject his bids for paramedic jobs, Defendant has failed to even meet this minimal burden because it offered evidence of the policy of denying re-entry requests for economic reasons to defeat the *prima facie* case. According to Plaintiff, since Defendant "chose to limit its arguments to the *prima facie* case of discrimination []," these claims must now proceed to trial. (Pl. Opp., p. 8.)

A review of the record, however, demonstrates that this is simply not true. While Defendant did offer its policy to attempt to defeat the *prima facie* case, it acknowledged that this evidence might be considered by the Court in its analysis of pretext.[18] More importantly, it should be emphasized that the *McDonnell Douglas* burden shifting framework is not to be applied in a mechanistic manner. Rather, it is merely a

---

[18] Specifically, Defendant observed that "[t]he City is mindful that the Sixth Circuit may treat these facts, not as an issue of whether Turner is 'qualified,' but rather as proof of the City's legitimate, non-discriminatory reason for not awarding a bid to Turner." (Def. Mot., p. 12.)

tool designed "to 'bring the litigants and the court expeditiously and fairly to the ultimate question'" of discrimination. *See Cline*, 206 F.3d at 660 quoting *Burdine,* 450 U.S. at 253. Defendant has brought the Court to the ultimate question by proffering a legitimate, non-discriminatory reason for each decision, and the Court will now touch upon each one in turn.

As previously discussed, Defendant defends its decision relating to Plaintiff's participation in the paramedic program by pointing to its recent policy of restricting re-entry for economic reasons. Defendant maintains that Plaintiff was suspended in 2003 because he "physically confronted Lt. Ragins," and sick pay was denied Plaintiff in 2007 because he failed to substantiate his claim of illness with a "proper doctor's slip containing a diagnosis […]." (Def. Mot., pp. 16-17, and 20.) It is Defendant's position that the decisions regarding overtime were governed by the non-discriminatory provisions of the collective bargaining agreement. (Def. Mot., p. 17.) Finally, according to Defendant, the Arson Investigator position was awarded to a candidate more qualified than Plaintiff. (Def. Mot., p. 19.)

### 3.    *Pretext*

The Court finds that each of these stated reasons qualifies as a legitimate, non-discriminatory reason and satisfies Defendant's burden of production. The burden now shifts back to Plaintiff to demonstrate that these stated reasons are merely pretext for racial discrimination. Plaintiff can meet this burden and refute each proffered reason by showing that the reason "(1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct." *Johnson v. Kroger Co*., 319 F.3d 858, 866 (6th Cir. 2003). *See*

*Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994).

Plaintiff begins by attacking Defendant's policy of denying requests to re-enter the paramedic program. He claims that the stated reason of "current economic concerns" is disingenuous because, in his view, it is less expensive to reinstate already certified paramedics, such as Plaintiff, than to train newly hired firefighters as paramedics and have them initially serve in the paramedic program for a set period of years. In fact, Plaintiff argues that "*returning Turner to the paramedic program would actually save the City the considerable expense of having to train another firefighter as a paramedic by allowing the City to defer the expense of training a non-paramedic until a later date.*" (Pl. Opp., p. 16, emphasis in the original.)

At best, Plaintiff's argument merely questions the wisdom of the City's allocation of resources for employee training. The Court, however, "will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives." *Doan v. Seagate Tech.,* 82 F.3d 974, 977 (10th Cir. 1996). *See Adams v. Tenn. Dep't of Finance and Admin*., 179 Fed. Appx. 266, 2006 U.S. App. LEXIS 11050 (6th Cir. 2006) (It is not enough that a court might have made a different business decision; there must be evidence of discriminatory animus.); *LeFlore v. Flint Indus., Inc.,* 1999 U.S. App. LEXIS 2898, *8-*11 (10th Cir. Feb. 23, 1999) (A pilot's belief that it would have made better business sense to retain someone like himself, who was both a copilot and a mechanic, than to hire a mechanic did not demonstrate pretext.) *See also Bush v. Am. Honda Motor Co*., 227 F. Supp. 2d 780, 797 (S.D. Ohio 2002) ("Courts are not intended to act as 'super personnel departments to second guess an employer's facially legitimate business decisions.'") quoting *Wells v. Unisource*

*Worldwide, Inc*., 289 F. 3d 1001, 1007 (7th Cir. 2002).

Defendant has brought forth evidence that it has, since 1985, required all newly hired firefighter/medics to become paramedics as a condition of employment. (Evans Aff., ¶ 8.) The record also shows that the collective bargaining agreement in place in 2005 and 2006 required the City to pay overtime training for all paramedics and permitted up to a maximum of 164 hours per year in overtime to attend paramedic training. (*Id*., ¶¶ 6-7.) Having made the commitment to train all new recruits as paramedics, and having been required by the collective bargaining agreement to provide all active paramedics with overtime pay, it follows that the City could avoid additional overtime expenses by refusing to permit former paramedics to return to the program.

"The pivotal issue in a Title VII claim of discriminatory employment practices is whether 'the employer treated some people less favorably than others because of their race' not whether the employer treated an employee less favorably than 'someone's general standard of equitable treatment.'" *Adams*, 179 Fed. Appx. at 272 quoting *Batts v. NLT Corp.*, 844 F.2d 331, 337 (6th Cir. 1988).  Plaintiff may not like this policy, but he has not offered evidence that it was racially motivated.

In fact, the record shows that this policy of denying re-entry requests for economic reasons was applied in a uniform and non-discriminatory manner across the board. Defendant represents that no one was permitted to voluntarily opt out of the paramedic program under the CBA and then later re-enter program after these financial concerns became known to Chief Gladman in 2005. (Gladman Aff., ¶ 4.)

Plaintiff has failed to come forward with any evidence to the contrary.[19] As such, the decision to deny Plaintiff re-entry into the paramedic program, as well as the denial of bids into paramedic positions and on the SWAT medic team, cannot support a claim of racial discrimination.

Regardless of whether the white firefighter/medics Plaintiff cites to as "comparables" truly are comparables, the treatment of these individuals does not constitute evidence of pretext. Several of the individuals who were allowed to "opt in" did so years before Chief Gladman made the decision to deny such requests for economic reasons. As for those who were allowed to return to the paramedic program recently, including two of the firefighters Plaintiff claims are his most direct comparators – Tim Semelsberger and Matt Acvinew – they either resigned from the City's employ or were discharged. When they returned to active employ, they were treated as "new hires" and required to fulfill the paramedic service requirement of all new hires. The fact that black firefighter/medics who left under circumstances similar to Semelsberger and Acvinew and were also treated as new hires upon their return severely undermines Plaintiff's pretext argument. (*See* Evans Aff., ¶ 20 A-D.)

In the same vein, Plaintiff has failed to come forward with any evidence that the denial of overtime, whether it be the guaranteed overtime that Plaintiff would have received as a paramedic or some other overtime opportunities Plaintiff believes that he was denied as a firefighter, was motivated by racial animus. Again,

---

[19] Plaintiff points to the 1999 decision to permit white firefighter John Beavers to re-enter the paramedic program. However, as Chief Gladman explained, he did not have the same economic concerns in 1999 that he had in 2005. (Gladman Aff., ¶ 4.) Plaintiff has failed to identify any individual, black or white, who has been permitted re-entry since the economic policy was put into place.

27

Plaintiff offers his analysis of Defendant's budget and his criticism of the policy of training new firefighters as paramedics when former paramedics would be available upon reactivation.[20] As the Court has already indicated, it will not second guess an employer's business decisions without some evidence that the decisions were the result of impermissible motives.[21] *LeFlore*, 1999 U.S. App. LEXIS 2898, *11.

Plaintiff has also failed to raise a genuine issue of material fact with respect to Chief Gladman's failure to select him as an Arson Investigator in 2006 and 2007. Chief Gladman averred that he selected Matt D'Avello in 2006 because he was already a certified arson investigator and had a strong academic background. (Gladman Aff., ¶ 11.) Likewise, he selected Ellis Polk in 2007 because he was a SWAT medic and had previous training in arson investigation. (Gladman Aff., ¶ 12.)

Chief Gladman was entitled to base his decision upon the fact that, in his opinion, D'Avello and Polk were more qualified than Plaintiff. The fact that Chief Gladman did not give weight to the fact that Plaintiff had more seniority on the force than these other two candidates does not raise an inference of race discrimination.[22] Moreover,

---

[20] Plaintiff also criticizes the provision in the 2007 collective bargaining agreement raising the minimum service of new hires as paramedics from five to eight years. (Pl. Opp., p. 18.) Of course, Defendant is not solely responsible for the contract provisions, but rather such provisions are the result of negotiations with the firefighters' union.

[21] Plaintiff also offers some unsubstantiated allegations that he was denied overtime opportunities as a firefighter. Specifically, he avers that "[o]n one occasion, Jeff Warner, a firefighter with less seniority than myself, was scheduled to work on his comp day when I had not been offered any overtime at all; there have been numerous other occasions when I observed firefighters with less seniority working overtime when I had none and had not been offered any overtime at all." (Pl. Decl., ¶ 19.) These vague complaints cannot raise an inference of discrimination.

[22] Though not dispositive, the fact that Chief Gladman, the decision-maker, shares the same race as Plaintiff further undermines Plaintiff's already weak showing of discrimination. (Gladman Aff., ¶ 2.) *See Neely v. United States Postal Serv.*, 2007 U.S. Dist. LEXIS 91159, *21, n.4 (E.D. Pa. Dec. 12, 2007) ("Although the fact that a [decision-maker] is a member of the same protected class as the plaintiff does not preclude a successful discrimination claim, it substantially weakens any inference of discrimination.") *See also Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 1002 (5th Cir. 1996) (finding that a decision-maker who was the same race as the plaintiff "considerably undermined the probability that race was a factor").

Plaintiff's subjective view of the value of his qualifications in relation to the selected applicants, without more, cannot sustain a claim of discrimination. *Hendrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004).

Finally, the fact that Plaintiff's pay was docked on two separate occasions does not suggest pretext. With respect to the suspension and loss of pay that resulted from the "bumping" of Lieutenant Ragins, an African-American firefighter, Plaintiff has failed to offer any evidence that his discipline was racially motivated. He has not pointed to any non-minority firefighters who were involved in altercations with co-workers and received more favorable treatment. Moreover, there is nothing about the incident, or the disciplinary action that followed, that raises the inference of race discrimination.

Plaintiff's pay was also docked in April, 2007. After reporting to work on April 17, 2007, Plaintiff was advised that he would be required to fill-in at another station. (Hiltbrand Aff., ¶ 6.) Plaintiff then left work because he was feeling ill. Plaintiff was advised by Lieutenant Leidel that he would need to present a doctor's note with a diagnosis if he wanted to use sick pay for this day, as, according to Defendant, is the policy for any firefighter who goes home sick after being advised that he will be filing-in at another station. (Hiltbrand Aff., ¶ 6; Bunner Aff., ¶ 15.) Plaintiff maintains that he provided a doctor's note but that his physician refused to put a diagnosis on the slip because such information was protected by HIPAA. (Turner Dep., 141-142.)

The Court need not comment on the accuracy of Plaintiff's physician's interpretation of federal law regarding privacy and patient's rights or the wisdom of Defendant's policy of requiring a doctor's note with a diagnosis for any

firefighter who reports off after being advised that he has be told that he will be required to "fill-in" elsewhere, because neither has a bearing on the issue of pretext. Plaintiff has not offered any evidence that the policy of requiring such a note under similar circumstances has not been applied across the board to all firefighters regardless of race.

These employment decisions and policies, whether considered separately or together, fail to demonstrate that they were the product of unlawful race discrimination. As such, Plaintiff has not met his burden and Defendant is entitled to summary judgment on his discrimination claims.

### D. <u>Retaliation Claim</u>

As previously observed, it is unclear from the Amended Complaint which actions Plaintiff believes were race-based and which were the result of retaliation. Plaintiff's briefing on summary judgment does little to clarify and distinguish these claims. Indeed, the opposition brief actually muddies the water.

In opposition to summary judgment, Plaintiff notes that "there is a series of racial and/or retaliatory harassing actions against Turner – some with adverse actions and some without – constituting a hostile environment in employment (particularly retaliatory) under 42 U.S.C. § 1981 and O.R.C. Chapter 4112." (Pl. Opp., p. 1.) Even applying the most liberal interpretation to the Amended Complaint, however, it is clear that Plaintiff has not pled a claim for retaliatory harassment. Nonetheless, the Court will address Plaintiff's retaliation claim, as well as any possible retaliatory harassment claim.

The same burden shifting analysis set forth in *McDonnell Douglas* applies to claims of retaliation. *See EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860

(6th Cir. 1997). In order to find a *prima facie* case of retaliation under Title VII, a plaintiff must establish that: (1) he engaged in activity protected by Title VII; (2) his exercise of his civil rights was known by the defendant; (3) that, thereafter, the defendant took action adverse against the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment decision. *Id*. at 860. *See Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987). In a harassment claim, a plaintiff can prove the third prong of the *prima facie* case by showing that he was "*subjected to severe or pervasive retaliatory harassment by a supervisor*." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (Emphasis in the original.) *See Ceckitti v. City of Columbus*, 14 Fed. Appx. 512, 516 (6th Cir. 2001).

        In addition to the 2002 lawsuit and the 2003 and 2005 OCRC charges, Plaintiff identifies three other times when he engaged in protected activity for which he believes he was retaliated against. In the "early 1990s," Plaintiff alleges that he wrote a letter to the editor of a local newspaper regarding statements made by a Caucasian firefighter, Lieutenant Richard Reyman, about a focus group of African-American firefighters that was created to address race issues in the City of Akron. (Pl. Decl. ¶¶ 22-24.) Plaintiff claims that after his letter appeared in the paper, he was chastised by unnamed superiors and advised that discipline was being contemplated. (*Id*., ¶¶ 25-26.) There is, however, no evidence that he was ever disciplined for the letter.

        Plaintiff wrote two other letters that he regards as protected activity. On December 12, 1996, Plaintiff directed a letter to "AFD administration setting forth concerns about racial discrimination with AFD […]." (Pl. Decl. ¶ 30, Ex. 2.) According to Plaintiff, Deputy Chief Bunner responded to this letter. The second "letter,"

dated August 20, 2002 and directed to Fire Administration, discussed the issues of racial harassment and retaliation.[23]

While the allegations are somewhat hazy, Plaintiff has identified several decisions that he believes are retaliatory. First, he highlights the decision to deny him re-entry into the paramedic program in 2005 and the subsequent refusal to appoint him to the SWAT medic team in 2006. He further claims that his decision to "opt out" of the paramedic program in 2003 was motivated by the fact that the City refused to rotate him into a non-paramedic job, as per the City's policy, in retaliation for his protected activity.[24] (Pl. Opp., p. 5; Pl. Decl. ¶ 12.) Finally, Plaintiff identifies the two times his pay was docked, in 2003 over the "bumping" incident involving Lieutenant Ragins and in 2007 over the failure to produce a doctor's note, as further instances of retaliation.[25]

"[A] significant gap in time between the protected activity and the adverse action cannot give rise to an inference of a retaliatory motive." *Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 344 (6th Cir. 2001) citing *Candelaria v. EG & G Energy Measurements*, 33 F.3d 1259, 1261 (10th Cir. 1994) ("No such inference [of a retaliatory motive] can be made where the relevant charges preceded the employer's adverse action by as much as three years."). *See Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 110-111 (1st Cir. 1988) (discharge over two and one half years after employee

---

[23] A response to the second "letter" was sent by Deputy Chief Bunner on August 29, 2002. It appears from Mr. Bunner's response that Plaintiff may have sent a second memo on August 21, 2002 on the issue of hostile work environment. (Pl. Decl. ¶ 30, Ex. 4.)

[24] Plaintiff's declaration directly contradicts his memo requesting withdrawal from the program. As previously discussed, in his September 5, 2003 memo to District Chief Hiltbrand, Plaintiff indicated that he wished to leave the paramedic program so that he could devote his time to other pursuits. (Evans Aff., Item 1.)

[25] To the extent that Plaintiff is arguing that other adverse actions identified in the Amended Complaint were retaliatory in nature, the Court's analysis in this section would apply equally to these actions, as well.

filed EEOC complaint was insufficient to support a retaliation claim.) The Court finds that the two letters written in the 1990s are too remote in time to establish a causal connection between the protected activity and the alleged adverse action.

The remaining actions taken by Defendant have a closer proximity in time to the protected activity. The alleged "forced" decision to "opt-out" of the paramedic program came almost 3 years after Plaintiff filed his first lawsuit against the City, and the suspension for "bumping" Lieutenant Ragins came 10 months after he filed suit. The denial of paid sick leave over the inadequate doctor's note came 5 months after he filed the present lawsuit. The adverse action which is the focal point of Plaintiff's discrimination and retaliation claims, the refusal to permit Plaintiff re-entry into the paramedic program in 2005, occurred more than 22 months after Plaintiff engaged in any of the protected activity identified in this lawsuit.

The Sixth Circuit has recognized that "in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, [] close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo v. Potter*, 358 F.3d 408, (6th Cir. 2004) (discharge 21 days after plaintiff filed his EEO complaint established the causal connection necessary for a *prima facie* case of retaliation). *See e.g., Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) (time period between the protected activity and the adverse action less than 2 months is sufficient to raise inference of retaliation). In general, however, "[t]he law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Tuttle v. Metro. Gov't*, 474 F.3d 307, 321 (6th Cir. 2007). In order to demonstrate a causal connection, a plaintiff must

ordinarily show "a temporal connection coupled with other indicia of retaliatory conduct." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364 (6th Cir. 2001).

   The time gaps between the protected activity and the alleged adverse actions are sufficiently large that Plaintiff must come forward with additional evidence to establish the casual connection. *See e.g., Martin v. GE,* 187 Fed. Appx. 553, 561 (6th Cir. 2006) (11 month interval between filing of EEOC complaint and adverse employment action not short enough to establish, by itself, a causal connection); *Parnell v. West,* 1997 U.S. App. LEXIS 12023 (6th Cir. May 21, 1997) ("A time lag of seven months does not necessarily support an inference of a causal link; previous cases that have permitted a *prima facie* case to be made based on the proximity of time have all been short periods of time, usually less than six months."); *McDaniel v. Potter*, 2007 U.S. Dist. LEXIS 79573, *58 (N.D. Ohio Oct. 26, 2007) (termination occurring 8 months after protected activity too remote in time, standing alone, to create an inference of retaliation).

   Plaintiff fails to offer any other "indicia of retaliatory conduct" that would support the finding of a causal connection between his protected activity and the adverse action. Plaintiff's bald speculation that the events are connected does not meet the burden of showing a genuine issue for trial. *Id.* Further, "the 'mere fact that an adverse employment decision occurs after a charge of discrimination is not [sufficient] to support a finding that the adverse employment action was in retaliation to the discrimination claim." *Balmer v. HCA, Inc.*, 423 F.3d 606, 615 (6th Cir. 2005) quoting *Booker v. Brown & Williamson Tobaco Co.*, 879 F.2d 1304, 1314 (6th Cir. 1989). Without more, Plaintiff cannot even demonstrate a *prima facie* case of retaliation.

   Assuming, *arguendo*, that Plaintiff had met his *prima facie*

34

burden,[26] the burden would have swung to Defendant, who offers the same legitimate, non-discriminatory reasons it did in defense of Plaintiff's discrimination claims. For the reasons offered above, these reasons satisfy Defendant's burden of production.

The final burden would rest with Plaintiff to prove by a preponderance of the evidence that the legitimate, non-discriminatory reasons were not the true reasons, but that the real reason was unlawful retaliation. *See Singfield*, 389 F.3d at 563; *Willis,* 104 F.3d at 862. Plaintiff can prove pretext for retaliation by making the same showing that would have resulted in a finding of pretext for his discrimination claims. See *Singfield*, 389 F.3d at 564. Like his proof offered in support of his discrimination claims, his proof offered in support of his retaliation claims comes up short.

To show pretext, Plaintiff relies upon the same evidence he offered to support his discrimination claims.[27]  This evidence no more establishes the existence of retaliation than it shows racial discrimination. The decision to deny Plaintiff re-entry into the paramedic program and the resulting decision to deny Plaintiff a position on the SWAT medic team were based on a City-wide policy that applied equally to all firefighters. Plaintiff has not demonstrated that the policy was not applied to those who did not engage in protected activity. Similarly, Plaintiff has not demonstrated that employees who were involved in altercations with other employees or who refused to

---

[26] The other elements of the *prima facie* case appear to have been met. It is undisputed that Plaintiff engaged in protected activity and Defendant does not suggest that it was unaware of the protected activity.
[27] Plaintiff notes in his opposition brief that "[i]t is axiomatic that pretext to both discrimination and retaliation can be proved using the same facts and inferences, as both are embodied under the same discrimination statutes under Title VII, Section 1981 and R. C. Chapter 4112." (Pl. Opp., p. 20.)

provide doctor's notes with diagnoses and did not engage in protected activity received better treatment. As such, Plaintiff has failed to demonstrate pretext, and summary dismissal of this claim is also appropriate. *See e.g., Parries v. Makino, Inc.,* 148 Fed. Appx. 291, 302 (6th Cir. 2005) (where same evidence failed to demonstrate pretext for either race discrimination or retaliation, summary judgment on both claims was properly granted).

Finally, even if Plaintiff had pled a retaliatory harassment claim, it would not survive summary judgment because Plaintiff cannot prove a *prima facie* case. In order to demonstrate retaliatory harassment, Plaintiff must show that he was subjected to "severe or pervasive retaliatory harassment by a supervisor." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). To demonstrate severe or pervasive retaliatory harassment, the plaintiff must show that "the workplace is permeated with discrimination, intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment […]." *Harris v. Forklift Sys.,* 510 U.S. 17, 21 (1993). An assessment of whether the alleged conduct is severe or pervasive is based on the totality of the circumstances alleged. *See Williams v. GMC*, 187 F.3d 553, 562 (6th Cir. 1999).

The few examples that Plaintiff points to as constituting harassment were discrete events spread out over a period of several years. Further, the decision to deny re-entry into the paramedic program and the decision to dock his pay for failing to provide medical documentation for an absence were pursuant to City-wide policies that Plaintiff has failed to show did not apply equally to all employees. These unrelated events, even when combined, cannot reasonably be considered to have risen to

the level of severe and pervasive. *See e.g., Ceckitti v. City of Columbus*, 14 Fed. Appx. 512, 517-518 (6th Cir. 2001) (unrelated discrete employment decisions, made pursuant to Company-wide policies, were not severe and pervasive).

## IV.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff's motion to strike is **DENIED**, and Defendant's motion for summary judgment is **GRANTED** in its entirety. This case is dismissed.

**IT IS SO ORDERED**.

Dated: January 2, 2008

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

37